<u>Not for Publication</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| RODNEY JOHNSON, | HON. JOHN MICHAEL VAZQUEZ |
| Petitioner, | |
| | Civil Action |
| v. | No. 15-2640 (JMV) |
| STEPHEN D'ILIO, et al., | |
| Respondents. | OPINION |

**VAZQUEZ, District Judge:**

## I.    INTRODUCTION

Petitioner Rodney Johnson has submitted an amended *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (Am. Pet., ECF No. 3.)  For the reasons stated herein, the petition is denied and no certificate of appealability shall issue.

## II.    BACKGROUND

The New Jersey Superior Court, Appellate Division, on direct appeal, summarized the facts underlying Petitioner's conviction as follows:[1]

> On November 12, 2004, at approximately eleven o'clock in the evening, two men, subsequently identified as [Petitioner and his brother and co-defendant, Lee Johnson[2]], robbed the United Fried

---

[1]  State court factual findings are presumed correct unless rebutted by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).  As Petitioner has not rebutted the factual findings of the Appellate Division by clear and convincing evidence, this Court will rely on those findings.

[2]  Lee Johnson filed a separate § 2254 petition in this District at Civil No. 2:15-cv-3197 (JMV) ("Lee Johnson's § 2254 Matter").  On May 30, 2018, the undersigned denied Lee Johnson's § 2254 petition with prejudice.  (*See* Lee Johnson's § 2254 Matter at ECF No. 13.)  The Court stresses that its analysis of Petitioner's current habeas claims is being conducted without reference

Chicken store located on the corner of Martin Luther King Drive (MLK) and Stegman Street in Jersey City. Several people were inside the store at the time, including David Ransom and his cousin James Ransom. . . .

At one point, Lee and various other individuals left the store. As David and James waited for their food order, Lee and Rodney re-entered the store and demanded that the patrons turn over their wallets. David testified that Lee wore a tan jacket and brandished a handgun.

David threw his wallet onto the floor as directed. Rodney, who was wearing a hooded sweatshirt with "Pepe" on the back and "dark denim with red and white stitching," recovered the wallet. According to David, when Lee made a comment to James Ransom about being "the big dog" in the neighborhood, Rodney began "sucker punching" David in the face. David attempted to block the blows from striking his face. At this point, David heard what sounded like shots being fired; when he turned, he saw Lee shoot his cousin James. Both defendants then "sped out" of the store. After they left, David heard more shots, this time coming from outside the store. James Ransom was subsequently pronounced dead; his death was ruled a homicide.

On cross-examination, David admitted that he did not actually see a gun in Rodney's hand. Moreover, despite not having any doubt that Lee and Rodney had been in the fried chicken store that evening, David conceded that the first time he had positively identified either of the defendants was at the time of trial. In fact, he could not recall whether he gave the police a taped statement after the incident.

Defense counsel then played for the jury a portion of the taped statement David gave to the police on November 13, 2004. On the tape, David identified one shooter as a man in a tan jacket and a second individual who had "[d]reds." By way of explanation for these memory mishaps, David claimed that he was emotionally distraught when he was at the police station after the shooting.

Robert A. Hennigar manages the Closed Circuit Television Unit of the Jersey City Police Department. At the time of this incident, closed circuit television cameras (CCTC) were located in the vicinity of the store where the robbery and shooting had occurred; these cameras were operational on the evening of the incident.

---

to – or reliance upon – its prior resolution of the habeas claims advanced in Lee Johnson's § 2254 Matter.

According to Hennigar, one camera was installed at the intersection of MLK Drive and Dwight Street and another camera was located at the intersection of MLK Drive and Stegman Street.

The morning after the incident, Hennigar became aware that portions of the robbery had been recorded by both cameras. Hennigar "removed the original VHS tapes that recorded the incident and placed them into evidence and then subsequently [gave] copies [of the tapes] to the homicide unit and the south detectives." He later copied the tapes onto a compact disc and printed his name on the bottom of it with the case identification information. These tapes were admitted by the trial court for the limited purpose of supporting and corroborating the testimony of several police officer witnesses. Portions of the tapes were played as particular police officers testified concerning what he observed when he arrived at the crime scene.

Jersey City Detective Victor Smith was working off-duty in uniform at a nearby recreational center when a woman reported that shots had been fired at the fried chicken store. As he walked towards the corner of MLK Drive and Stegman Street, Smith reported the alleged shooting to the appropriate precinct.

As he neared the store, Smith heard the sound of gunshots and saw simultaneous flashes from the store's window. He confirmed via radio that shots were being fired and requested immediate backup. When he was approximately fifteen feet away from the store, Smith saw defendants leaving the store and "brandishing weapons." By the time Smith arrived, "the gunshots had stopped;" it was at this point that Smith saw a man he recognized as Jamal Roach "just laying there lifeless" in the doorway of the store.

What occurred next can best be characterized as the real-life equivalent of a fictional police drama. According to Smith, Rodney Johnson began shooting at him "at almost point blank range;" Lee Johnson, who "had a gun in his hand as well," also fired at Smith. Rodney then ran across the street and began exchanging gunfire with Smith "for probably forty seconds or more." At this point, another Jersey City police unit arrived and engaged in gunfire with Rodney. Smith estimated that by the time Rodney fled the scene running toward Dwight Street, Rodney had fired "more than seven or eight shots at me and I had fired more than seven or eight shots back at him." In the midst of this harrowing chaos, Smith lost track of Lee Johnson's whereabouts.

As other officers were dispatched to pursue and apprehend Rodney and Lee Johnson, Smith and fellow officers Scott Rogers and Eddie Nieves went inside the store to assess the situation and protect the crime scene. Once inside, Smith saw James laying on the floor and bleeding from his mouth and head; David was also on the floor, crying and "very upset[.]"

According to Rogers, Roach, who was "laying right in front of the doorway," told him he had been shot in the leg. Rogers "briefly checked [James] for a pulse," but he "was in an apparently lifeless condition." Rogers also noted several shell casings surrounding James. The prosecutor played the Composite CD while Rogers testified and directed Rogers to demonstrate his course of action by referring to the scene displayed on the CD.

Officer Christopher Baker testified that as he and Officer Brian Glasser approached the store in response to Smith's radio call they heard shots being fired. According to Baker, he saw an African-American man with dreadlocks and wearing a black jacket, later identified as Rodney Johnson, step over a body laying in the doorway of the store. As he stepped out of the marked police car, he saw that Rodney "backed up a little bit" and began shooting at Smith. Baker then "immediately drew [his] weapon and discharged a round at him." Rodney continued firing at Smith and thereafter at Baker and Glasser.

While he was attempting to take cover from the gunfire, Baker saw a second African-American man wearing a dark jacket raise a handgun in Smith's direction; that individual was later identified as Lee Johnson. Baker fired two rounds at Lee, and the second round struck him in the area of his lower torso. Lee "flipped over himself and fell"; he then got up and started to walk eastbound on Stegman Street.

When the shooting between Rodney and Smith stopped, Rodney ran south on MLK Drive towards Dwight Street while shooting in the officers' direction. Pursuant to Smith's instructions, Baker and Glasser began to chase Rodney. From a distance of approximately four to five car lengths, Baker observed Rodney "discard a black object to the ground and then continue walking[.]" That object was later identified as David's wallet.

Baker also observed Rodney toss a second black object over a fence; Glasser went to recover this object while Baker continued chasing Rodney. Eventually, other officers arrived at the scene and took Rodney into custody. The prosecutor played a portion of the

Composite CD to assist Baker in demonstrating the events he described in his testimony. Although Baker positively identified the jackets that both defendants were wearing, he conceded that the CD did not show Rodney stopping while he was being pursued. Glasser's testimony corroborated Baker's version of the events.

The State's account of the circumstances of Rodney Johnson's arrest came from the testimony of Officer Christopher Monaghan. According to Monaghan, while on duty on the night in question, he heard radio reports of shots being fired. As he and his partner, Officer Mark Minervini, were driving towards the scene of the incident, he heard a "radio transmission [] of a foot pursuit going south on MLK Drive now going west on Dwight" Street. Heading towards Dwight Street and Bergen Avenue, Monaghan "observed a black male standing on the . . . northeast corner of Dwight and Bergen" and "heard transmissions from officers that were coming west on Dwight that that's him on the corner."

This individual, later identified as Rodney Johnson, was the only person on the street. Monaghan and Minervini stepped out of their marked police vehicle, drew their weapons, and ordered Rodney to show his hands. Instead of doing so, however, Rodney "nonchalantly just walked across Bergen Avenue to the other side never taking his hands out of his pockets" and informed the officers that he was "just here to see [his] son . . . in front of the building." Monaghan walked across the street and, because the suspect had refused to show the officers his hands, Monaghan "kicked the individual in his chest, put [his] service weapon away" and "turned him over on his stomach and [] started to pat him down."

Rodney was then transported to the Jersey City Medical Center where he was treated for a gunshot wound. The State and both defendants stipulated that "in [the] early morning hours of November 13, 2004[,]; Rodney Johnson was treated at the Jersey City Medical Center for a gunshot wound. He was treated and related after stitches were applied."

In a fenced-in backyard nearby, Officer Carlos Lugo found the handgun tossed by Rodney as he was being pursued by the police. Officer Minervini stayed at the scene of the incident to assist the other officers in recovering items which they observed Rodney discard during the pursuit. On Dwight Street near Bergen Avenue, Minervini "observed a wallet next to a chain link fence." He noted that "[i]t didn't look like it had been out there for long because it was raining and the wallet was dry." He picked up the wallet, placed

it in a bag and "secured it on [his] person." The wallet contained an identification card in the name of decedent James Ransom.

The State also presented evidence that two handguns, matching the ballistic characteristics of the weapons used by defendants, were recovered. Specifically, the police recovered a black forty caliber Baretta handgun from the fenced-in yard; seven shell casings were also recovered inside the fried chicken store next to the victim's body. The police also found a loaded Glock 17 nine millimeter handgun laying in the street on the southeast corner of Stegman Street.

At approximately 2:00 a.m. on November 13, 2004, City of Newark Detective Richard Warren received a phone call from central command advising him that Beth Israel Hospital in Newark had reported that "[a] person just arrived at the hospital and [] was a victim of a gunshot injury." At the hospital, Warren interviewed the individual who identified himself as Duval Williams. [Defendant Lee Johnson is also known as Duval Johnson.] He told Warren that while walking home from the bus "he was approached by two unknown black males and somehow they started asking him questions." He alleged that a verbal altercation ensued and that one of the males "pulled out a gun . . . and he was shot in the back area or the buttocks area as he was fleeing from the two individuals."

Warren also interviewed Lola Williams, the woman who had brought "Duval Williams" to the hospital and identified herself as his girlfriend, "Lola Powell." According to Warren, Ms. Williams said that they had been at Duval's grandmother's house before he was shot. When Warren went to the scene of the purported incident, he did not find any evidence to support Duval's version of events. When Warren went to the address where Duval's grandmother allegedly lived, a man answered the door, identified himself as Duval's uncle, and said that Duval's last name was Johnson, not Williams. Both the uncle and grandmother denied that Duval lived at the house and neither could remember the last time that they had seen him. When Warren re-interviewed Lola Williams, she admitted that Lee Johnson, a/k/a Duval Williams, had been shot in Jersey City.

Jersey City Detective Kevin Wilder testified that he collected the clothing worn by Rodney and Lee Johnson when they were both hospitalized and received treatment for gunshot wounds. Wilder collected a "red, black, white and yellow warm[-]up jacket" and a "red, white and blue warm[-]up jacket" from the Jersey City Medical Center both of which were taken from Rodney Johnson.

Lee was treated for his wounds at Newark Beth Israel Hospital Medical Center. Wilder collected from this medical facility the following items of clothing worn by Lee when he was admitted to the hospital under the name "Duval Williams": a pair of brown boots, a white thermal long sleeve shirt, a grey hooded sweatshirt, a pair of black and blue gym shorts, boxer shorts, and a pair of blue jeans with a black and white leather belt. Wilder confirmed that Lee was not wearing a jacket when he first reported for treatment of his gunshot wound.

On November 13, 2004, Jersey City Detective Timothy Kaminski received a phone call from a woman who resided across the street from the fried chicken store, claiming to have found certain suspicious items on her property. When Kaminski reported to the property he saw "two jackets and some drug paraphernalia on the ground which were hanging on the fence of the property." Kaminski described the items of clothing as brown Carhart jackets, "one with a hood, one without." Officer Smith identified one of the jackets as the one worn by Lee during the incident.

The State also presented expert testimony concerning James's manner of death and identification of the handguns and spent shell casings recovered from the scene. According to the State's firearm expert, the handgun Glock model 17 recovered by the police on the street next to the fried chicken store was the weapon used to kill James. This handgun also matched two spent casings found on the floor of the store. The expert also opined that the third bullet removed from James's body was fired from the forty caliber Baretta, the weapon recovered by the police from the fenced-in yard. The same Baretta also discharged five of the spent casings found inside the store.

The State called Jersey City Detective Calvin Hart to testify about his efforts to interview Jamal Roach and Charles Porter. According to Hart, by the time he arrived at the scene of the incident, Roach, the individual who had been shot and was laying in the doorway, had been transported to Jersey City Medical Center. When Hart attempted to speak to Roach at the hospital, he was "uncooperative" and "evasive."

Hart had a similar experience when he attempted to interview Porter. According to Hart, when Porter was shot in the store, he "ran up the street to a friend's house and a friend called the ambulance at that time." Detectives at the scene were able to locate him from both "a trail of blood" in the store and "the phone call to the Medical

Center." Hart testified that Porter too was "[e]vasive, like [he] didn't really want to be involved."

By the time the cases against the Johnson brothers came to trial, Roach was serving a four-year sentence on an unrelated matter. Counsel for Rodney Johnson called Roach to testify as one of the victims of the shooting. According to Roach, while he was in the fried chicken store, "two people came in, told everybody to lay down and started shooting." He described one of the men as a short "light skinned" African-American man with dreadlocks; he described the other assailant as a tall "brown skinned" African-American man with dreadlocks.

Roach testified that the "light skinned" man shot him twice. According to Roach, however, Lee and Rodney were not the men who shot him. In fact, Roach testified that Rodney was laying on the floor next to him during the robbery. On cross-examination, Roach conceded that in the statement he gave to the police three hours after the incident, he told the officer who interviewed him that he could not describe the individuals who shot him.

Porter was called as a witness by the attorney who represented Lee Johnson. According to Porter, while inside the store, he saw "five or six guys" come in "with dreds intending to rob the chicken spot;" one of the men ordered "everybody [to] get down." Because he "refused" to lay down, one of the men shot him and "took off after that[.]" Porter confirmed that he told the responding officers that the shooter wore a "green army fatigue jacket." Similar to Roach's account of events, Porter testified that neither Lee nor Rodney Johnson were among the shooters.

After being advised of their rights on the record, both defendants decided not to testify.

*State v. Johnson*, No. A-6330-06T4, slip op. at 5-18 (N.J. Super. Ct. App. Div. Apr. 9, 2010)

(available at ECF No. 9-11).

Petitioner and his brother's joint-trial began on May 30, 2006 and concluded on June 15, 2006; trial proceedings were conducted over nine days during that span. At the conclusion of trial, Petitioner was found guilty of (i) second-degree conspiracy to commit armed robbery, N.J.S.A. §§ 2C:15-1, 5-2; (ii) purposeful or knowing murder, N.J.S.A. §§ 2C:11-3a(1), 3a(2); (iii) felony

murder, N.J.S.A. § 2C:11-3a(3); (iv) two counts of first-degree armed robbery, N.J.S.A. § 2C:15-1; (v) third-degree knowing possession of a handgun without a permit, N.J.S.A. § 2C:39-5b; and (vi) second-degree knowing possession of a handgun for an unlawful purpose, N.J.S.A. § 2C:39-4a. *Id.* at 4. (*Accord* June 15, 2016 Trial Tr. vol. IV, 178-81, ECF No. 9-74.)

On September 21, 2006, the trial court sentenced Petitioner to an aggregate term of life imprisonment, with an eighty-five percent period of parole ineligibility. *Id.* at 5. The Appellate Division affirmed Petitioner's conviction and sentence on April 9, 2010. *Id.* at 34. The New Jersey Supreme Court denied certification of Petitioner's direct appeal on September 23, 2010. (ECF No. 9-17.)

Petitioner thereafter filed two separate post-conviction relief ("PCR") applications in state court. Petitioner filed his first PCR petition on or about February 10, 2011. (*See, e.g.*, ECF No. 9-18.) The PCR court held a hearing on the first PCR application on March 29, 2012. (PCR Hr'g Tr., ECF No. 9-77.) The PCR court then denied Petitioner's first PCR petition. (ECF No. 9-22.) Petitioner appealed the denial to the Appellate Division on August 31, 2012, (ECF No. 9-23), and the Appellate Division affirmed the denial on August 7, 2014. *State v. Johnson*, No. A-0251-12T4, slip op. at 4 (N.J. Super. Ct. App. Div. Aug. 7, 2014) (available at ECF No. 9-28). The New Jersey Supreme Court denied certification of Petitioner's first PCR appeal on January 21, 2015. (ECF No. 9-30.)

Petitioner filed his second PCR petition while his first PCR appeal was still pending. (*See, e.g.*, ECF No. 9-31.) As such, on April 15, 2013, the PCR court entered an order dismissing Petitioner's second PCR petition without prejudice. (ECF No. 9-32.) Petitioner appealed the PCR court's dismissal to the Appellate Division. (*See* ECF Nos. 9-33, 9-34, 9-35, 9-36, and 9-37.) On October 9, 2013, the Appellate Division dismissed Petitioner's second PCR appeal "without

prejudice pending decision of [Petitioner's] first PCR petition." (ECF No. 9-40.) It appears that Petitioner thereafter abandoned further pursuit of his second PCR petition.

Petitioner initiated the present § 2254 action on April 13, 2015. (ECF No. 1.) This matter was originally before Chief District Judge Jose L. Linares. Petitioner filed his amended § 2254 petition on May 20, 2015. (ECF No. 3.) Chief Judge Linares succinctly summarized the claims raised as follows:

> [Ground One -] the state courts erred in affirming the trial court's decision to exclude the public during jury selection and that his right to a public trial under the Sixth and Fourteenth Amendments was therefore violated;
>
> [Ground Two -] [Petitioner] received ineffective assistance of trial counsel in so much as trial counsel failed to object to the closure of the court room during jury selection, failed to review discovery with Petitioner, failed to consult with Petitioner, and failed to use an investigator or otherwise adequately investigate Petitioner's case;
>
> [Ground Three -] Petitioner received ineffective assistance of PCR counsel[;] and
>
> [Ground Four -] the state [appellate] court erred when it affirmed the petitioner's conviction on direct appeal.

(Aug. 19, 2015 Memo. Order, ECF No. 5 (citing Am. Pet. at 19-20).)

On August 19, 2015, Chief Judge Linares issued a Memorandum Order which, among other things, (i) dismissed Ground Three of Petitioner's amended habeas petition, as Petitioner's claim of ineffective assistance of PCR counsel, "is not cognizable in a 2254 petition"; (ii) dismissed Ground Four of Petitioner's amended habeas petition as being duplicative of Petitioner's Ground One and Ground Two claims and as otherwise being insufficiently pled; and (iii) required Respondents to file a full and complete answer to Grounds One and Two of Petitioner's amended habeas petition. (*Id.* at 2-4.)

On September 8, 2015, Petitioner filed a Notice of Objection ("Objection") which, *inter alia*, challenged the dismissal of Grounds Three and Four of Petitioner's amended habeas petition. (ECF No. 6.)  On September 10, 2015, Chief Judge Linares issued an Order which, among other things (i) construed Petitioner's Objection as a motion for reconsideration of the Court's August 19, 2015 Memorandum Order; and (ii) found that Petitioner's Objection failed to present any basis for the Court to reconsider its August 19th rulings.  (ECF No. 8.)

Respondents thereafter filed their answer on September 23, 2015.  (ECF No. 9.)  Petitioner filed a reply on November 3, 2015.  (ECF No. 10.)  On February 23, 2016, this matter was reassigned to the undersigned.  (ECF No. 11.)

## III. STANDARD OF REVIEW

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution, laws, or treaties of the United States. *See Engle v. Isaac*, 456 U.S. 107, 119 (1982); *see also Mason v. Myers*, 208 F.3d 414, 415 n.1 (3d Cir. 2000) (citing 28 U.S.C. § 2254).  In accordance with the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104–132, 110 Stat. 1214 (Apr. 24, 1996), federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.  *See* 28 U.S.C. § 2254(d).

As a threshold matter, a court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'"  *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law' under §

2254(d)(1) is the governing legal principle set forth by the Supreme Court at the time the state court renders its decision." *Id.* (citations omitted). A federal habeas court making an unreasonable-application inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *See Williams v. Taylor*, 529 U.S. 362, 409 (2000). Thus, "a federal court may not issue a writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

The AEDPA standard under § 2254(d) is a "difficult" test to meet and is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The petitioner has the burden of proof and, with respect to § 2254(d)(1), review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.*

In applying AEDPA's standards, the relevant state court decision that is relevant is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008). Furthermore, a reviewing court will assume that, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Wilson v. Sellers*, 138 S. Ct. 1188, 1194 (2018). AEDPA deference also is not excused when state courts issue summary rulings. For example, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 62 U.S. 86, 99 (2011) (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)).

**IV. ANALYSIS**

Petitioner's amended habeas petition raises two grounds which require further analysis by this Court:

> Ground One: Petitioner was denied his constitutional right to a public trial and due process . . . when the trial court *sua sponte* closed the courtroom during jury selection.
>
> Ground Two: Petitioner received [] ineffective assistance of trial counsel.

(Am. Pet. at 19-20, ECF No. 3 (capitalization in original omitted).) Each claim will be addressed in turn.

**A. Ground One: Public Trial**

In Ground One, Petitioner asserts that he was denied of his rights to a public trial and due process "when the trial court *sua sponte* closed the courtroom during jury selection." (Am. Pet. at Ground One.) The record also makes clear that neither Petitioner nor his counsel raised a contemporaneous objection to the foregoing actions of the trial court (*see* May 31, 2006 Trial Tr., ECF No. 9-42). Instead, it appears that Petitioner first challenged these actions on direct appeal. *See Johnson*, slip op. at 20 (N.J. Super Ct. App. Div. Apr. 9, 2010). The Appellate Division addressed this claim as follows:

> At the start of the trial, but before any prospective jurors had arrived in the courtroom, the trial judge made the following announcement to all present:
>
>> Alright, ladies and gentlemen, let me just explain something to you. I see that there are five people here who have come to view this trial and you're welcome here and you know that you've been here before and you're always welcome.
>>
>> The only problem is I have a very small courtroom and I'm trying to call up as many jurors as I can and what's going to happen is I'm going to end up filling these boxes and they're going to be standing up there and I just don't have room for

you and I can't do anything where I'm keeping you – I have to keep you separate from these jurors and there's no way I can do it in a courtroom this small.

So I apologize to you but I'd like you to leave if you would please, at least until we get you know through some of the jurors and obviously anything that happens during the case you'll be welcome you know you'll come back in and you know once we have the fourteen in the box, you're free to come and go as you please. But I just don't have the room. I just don't have the physical room.

You see that I only have four rows and I have two defendants and I need I'm calling up seventy jurors and it's not really probably not even enough but that's all I can fit here and I can't fit that many if I have you guys, okay? So you know obviously you can stay in the hallway but the only thing is if you would stay down towards the other end, I a – it's very important that you not mingle with these jurors in any way.

You certainly – we don't want that to happen, it's not permitted and you certainly don't want anybody saying anything about you and you know that you were there, you were talking to somebody or anything like that. So you'll end up riding up and down the elevators with the jurors and stuff like that. You can't talk to them, okay?

So thanks very much, I really appreciate it but I'm going to need all those seats.

. . . .

The constitutional guarantee to a public trial, as expressed in both the federal and State constitutions, applies to all phases of the trial, including jury selection. *Press-Enterprise Co. v. Superior Court of Cal.*, [464 U.S. 501]; *State v. Cuccio*, 350 N.J. Super. 248, 260 (App. Div.), *certif. denied*, 174 N.J. 43 (2002). If a defendant is denied the right to a public trial, the error is deemed "structural," which mandates reversal of the conviction without a showing that the defendant was prejudiced by the denial. *Neder v. United States*, [527 U.S. 1, 7-9] (1999); *Waller v. Georgia*, [467 U.S. 39, 49-50] (1984).

That being said, the right to a public trial is not absolute. The trial judge retains the authority to impose "reasonable, and, as circumstances may dictate, well-considered limitations on access to

a trial in order to prevent situations which might impede the progress or fairness of the trial, as long as basic rights involved are not unduly infringed." *Cuccio*, *supra*, 350 N.J. Super. at 266.

In *Cuccio*, the trial judge removed from the courtroom all members of the defendant's and victim's family, including the defendant's brother who was a lawyer and had been assisting defense counsel in the case, and "all spectators." *Id.·*at 265. The judge in *Cuccio* gave as reasons for the removal: (1) the possibility of spectators and family members mingling with potential jurors; and (2) not enough seats to accommodate the public and the number of jurors on the panel. *Ibid.*

Over the defendant's strong objections, jury *voir dire* began and continued until the jury was selected, outside the presence of all of the defendant's and the victim's family members. *Id.* at 258. The process to select the jury took more than a day. *Ibid.* The trial judge denied the defendant's motion for mistrial. *Ibid.* Against these facts, we reversed the defendant's conviction, holding that the measures taken by the trial court violated the defendant's right to a public trial. *Id.* at 265. With respect to the trial court's concerns about the possibility of jurors mingling with spectators and the problem associated with the size of the courtroom, we made the following observations:

> At the time the judge ordered the exclusion, there was nothing in the record to suggest a likelihood that the families or other spectators were likely to make improper remarks within the hearing of the jurors. Moreover, it seems that reasonable alternatives to closure were available. For example, the judge could have instructed the families and other spectators not to mingle with the potential jurors or say anything concerning the case that might be overheard by them. If the problem was primarily one of sufficient seating, additional chairs could have been brought into the courtroom so that at least some members of defendant's family and the victim's family could observe the jury selection process. The judge's concern regarding the families or other spectators mingling with the prospective jurors could also have been addressed by an order requiring observers to be segregated from prospective jurors, such as by keeping some of the prospective jurors in other parts of the courthouse until they were needed in the courtroom. The judge might even have arranged for temporary use of a larger courtroom for jury selection, and then moved the balance of the trial back to his own courtroom.

[*Cuccio*, *supra*, 350 N.J. Super. at 265-66.]

We recently had occasion to revisit this issue in *State v. Venable*, ___ N.J. Super. ___ (App. Div. 2010) (slip op. at 5), where the trial court ordered that, for security reasons, "individuals" from either the "victim's family" or the "defendants' family" be removed from the courtroom during jury selection. In rejecting the defendant's argument that these restrictions violated his right to a public trial, we noted:

> First, there is no evidence that any members of the victim's or defendants' families were in the courthouse and desired to attend jury selection. Thus, there is no basis for a finding that any specific person was excluded from the jury selection stage of the trial. Second, neither defendant objected to the court's statement that members of the victim's and defendants' families would not be allowed in the courtroom during jury selection. As a result, the court did not have an opportunity to explore whether there were other measures available, short of total exclusion of family members, for preserving the security of the courtroom during jury selection.
>
> [*Ibid.*]

Here, the trial judge's instructions were apparently directed at "five people who [had] come to view this trial." Addressing this group directly, the judge informed them that due to the small size of the courtroom, the number of prospective jurors expected, and the need to keep the public "separate" from the prospective jurors, they would have to leave the courtroom. Another key factor here is the duration of the exclusion. In this respect, the trial judge advised the five spectators that they would have to leave the courtroom "at least until we get . . . through some of the jurors . . . [Y]ou'll come back in . . . once we have the fourteen in the box, you're free to come and go as you please."

From these words we infer that the judge intended to limit the duration of the exclusion to the time it took for the *voir dire* process to excuse a sufficient number of prospective jurors to free up enough space in the courtroom to accommodate the five members of the public. Although we are unable to ascertain how much time transpired before the members of the public were able to return, we are satisfied that such period of time was constitutionally insignificant.

As we noted in *Venable*, although the right to a public trial is constitutionally guaranteed, "this does not mean that any exclusion of persons from the courtroom during the course of trial proceedings, no matter how brief or insignificant, automatically constitutes a denial of the right to a public trial that necessitates a new trial." *Venable*, *supra*, ___ N.J. Super. at ___ (slip op. at 7). In certain circumstances, the temporary exclusion of the public from a criminal trial may be too "trivial" to warrant the reversal of an otherwise proper conviction. *Ibid.*

. . . . [I]n determining whether a particular violation of the right to a public trial may be considered "trivial," a reviewing court "looks to whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant – whether otherwise innocent or guilty – of the protections conferred by the Sixth Amendment." [*Id.* at 8 (quoting *Peterson v. Williams*, 85 F.3d 39, 42 (2d Cir.), *cert. denied*, [519 U.S. 878] (1996)).

Here, the temporary exclusion of members of the public was limited in both scope and duration, and there was no objection by defense counsel at the time the court gave the order. We are thus satisfied that the circumstances presented here are more in line with the situation we confronted in *Venable* than in *Cuccio*.

*Johnson*, slip op. at 23-30[3] (N.J. Super. Ct. App. Div., Apr. 9, 2010).

The Sixth Amendment guarantees the "accused . . . the right to a . . . public trial," U.S. Const. amend. VI, and extends that guarantee to the *voir dire* of potential jurors. *See, e.g.*, *Presley v. Georgia*, 558 U.S. 209 (2010). The public trial requirement is "for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions[.]" *Waller* 467 U.S. at 46 (1984) (internal citations and quotations omitted). Thus, a "party seeking to close a hearing must advance an overriding interest that is

---

[3] This Court has reviewed the relevant portions of the record (*see* May 31, 2006 Trial Tr., ECF No. 9-42), and has confirmed that the Appellate Division's factual summary of the relevant *voir dire* proceedings is accurate.

likely to be prejudiced [in the absence of closure], the closure must be no broader than necessary

to protect that interest, the trial court must consider reasonable alternatives to closing the

proceeding, and it must make findings adequate to support the closure." *Id.* at 48.

As the explained by the Third Circuit:

> In general, the denial of a defendant's right to a public trial is a
> "structural error"—*i.e.* a defect "affecting the framework within
> which the trial proceeds"—requiring reversal irrespective of
> whether the defendant demonstrates the error prejudiced his
> substantial rights. *See Arizona v. Fulminante*, 499 U.S. 279, 310[]
> (1991) (canvassing cases and delineating the scenarios in which
> structural errors have been recognized). "It does not necessarily
> follow, however, that every deprivation in a category considered to
> be 'structural' constitutes a violation of the Constitution or requires
> reversal of the conviction, no matter how brief the deprivation or
> how trivial the proceedings that occurred during the period of
> deprivation." *Gibbons v. Savage*, 555 F.3d 112, 120 (2d Cir. 2009),
> *cert. denied*, [130 S. Ct. 61] (2009). That is, "not every improper
> partial closure implicates [Sixth Amendment] concern[s]." *Brown
> v. Kuhlmann*, 142 F.3d 529, 536 (2d Cir. 1998); *see also Bowden v.
> Keane*, 237 F.3d 125, 129 (2d Cir. 2001) (explaining that a
> defendant's right to a public trial "is not trammeled, for example, by
> a trivial, inadvertent courtroom closure") . . . .
>
> Whether a particular closure abridges a defendant's Sixth
> Amendment rights hinges on its potential to undermine the values
> advanced by the public trial guarantee, which include (1) ensuring a
> fair trial; (2) reminding the government and the judge "of their
> responsibility to the accused and the importance of their functions";
> (3) encouraging witnesses to come forward; and (4) discouraging
> perjury. *Peterson v. Williams*, 85 F.3d 39, 43 (2d Cir. 1996). In
> *Peterson*, for example, the Second Circuit held a closure that was
> "1) extremely short, 2) followed by a helpful summation, and 3)
> entirely inadvertent" did not, in that instance, violate a defendant's
> Sixth Amendment rights. 85 F.3d at 44[;] . . . *see also United States
> v. Perry*, 479 F.3d 885, 890–91 (D.C. Cir. 2007) (finding a district
> court's exclusion of the defendant's son to be a trivial closure
> insufficient to raise constitutional concerns).
>
> Courts have continued to conduct triviality analyses in the wake of
> *Presley's* holding that the Sixth Amendment extends to *voir dire*
> proceedings. In *Barrows v. United States*, 15 A.3d 673, 680-81
> (D.C. 2011), the Court of Appeals for the District of Columbia

> affirmed a conviction after concluding a "brief closure of the
> courtroom during *voir dire*" had not "seriously compromised the
> fairness or integrity of [the defendant's] trial."

*United States v. Greene*, 431 F. App'x 191, 194-95 (3d Cir. 2011) (additional citations omitted).

In *Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017), the United States Supreme Court reaffirmed that "in the case of a structural error where there is an objection at trial and the issue is raised on direct appeal, the defendant generally is entitled to 'automatic reversal' regardless of the error's actual 'effect on the outcome'"; that although "the public-trial right is structural, it is subject to exceptions"; that "courtroom closure is to be avoided, but that there are some circumstances when it is justified"; and that "a judge may deprive a defendant of his right to an open courtroom by making proper factual findings in support of the decision to do so." *Weaver*, 137 S. Ct. at 1909 (citing, *inter alia*, *Waller*, 467 U.S. 39; *Neder*, 527 U.S. 1; *Presley*, 558 U.S. 209). The Supreme Court recognized the reality that "[t]he problems that may be encountered by trial courts in deciding whether some closures are necessary, or even in deciding which members of the public should be admitted when seats are scarce, are difficult ones." *Id.* at 1909. The *Weaver* Court added:

> A public-trial violation can occur . . . simply because the trial court
> omits to make the proper findings before closing the courtroom,
> even if those findings might have been fully supported by the
> evidence. It would be unconvincing to deem a trial fundamentally
> unfair just because a judge omitted to announce factual findings
> before making an otherwise valid decision to order the courtroom
> temporarily closed. As a result, it would be likewise unconvincing
> if the Court had said that a public-trial violation always leads to a
> fundamentally unfair trial.

*Id.* at 1909-10.

As the foregoing makes clear, the right to a public trial "is not absolute." *United States v. Patton*, 502 F. App'x 139, 141 (3d Cir. 2012). Instead, "[a]n unjustified courtroom closure only

infringes a defendant's Sixth Amendment rights if it undermines the values the Supreme Court identified in [*Waller*] as fundamental to the public trial guarantee." *Patton*, 502 F. App'x at 141 (citations omitted). Thus a closure is trivial and not a constitutional violation if the closure did not jeopardize the values "which (1) ensure a fair trial, (2) remind the government and judge of their responsibility to the accused and importance of their functions, (3) encourage witnesses to come forward, and (4) discourage perjury[.]" *Id.* at 141-42; *see also Perry*, 479 F.3d at 890 ("A courtroom closing is trivial if it does not implicate the values served by the Sixth Amendment as set forth in *Waller*.") (internal quotation marks and citations omitted). "In determining whether a closure was trivial, [this Court] examine[s] the actions of the [state] court and their effect on the conduct of the trial." *Patton*, 502 F. App'x at 142. Triviality is not determined by a single factor. *Id.*

In this case, the detailed findings of the Appellate Division demonstrate that the temporary removal of non-venire members from the courtroom was trivial in nature.[4] The record

---

[4] When Petitioner was tried in 2006, there was some uncertainty whether courts had to review reasonable alternatives to courtroom closure "*sua sponte*, or whether the party opposing closure had to propose them. In 2010, several years after [Petitioner's] trial, the [Supreme Court] resolved this possible uncertainty, holding that "trial courts are required to consider alternatives to closure even when they are not offered by the parties[.]" *Tucker*, 677 F. App'x at 778 (3d Cir. 2017) (citing *Presley*, 558 U.S. at 214). The Supreme Court issued its *Presley* opinion on January 10, 2010. The Appellate Division issued its decision affirming Petitioner's direct appeal on April 9, 2010. (ECF No. 9-11.) The Appellate Division's opinion does not reference *Waller*, nor does it otherwise discuss whether the trial court should have considered alternatives to courtroom closure. It therefore appears that the last-reasoned decision of the state court addressing the merits of Petitioner's public-trial right claim failed to address a critical point under then-established federal law, notwithstanding that this right had not yet been established at the time that the action being challenged actually occurred. *See Greene v. Superintendent Smithfield SCI*, 882 F.3d 443, 446 (3d Cir. 2018) ("clearly established Federal law" must be determined as of the date of the last relevant state-court decision"); *but see Greene v. Fisher*, 565 U.S. 34, 38("§ 2254(d)(1) requires federal courts to 'focu[s] on what a state court knew and did,' and to measure [those actions] 'against this Court's [then-established] precedents . . . .'") (citations omitted). As such, although this Court finds the Appellate Division's decision to be instructive, it will review Petitioner's Ground One claim *de novo*. *See Tucker*, 677 F. App'x at 778 (3d Cir. 2017) ("Because the [Pennsylvania state

demonstrates that the trial judge (i) advanced an overriding interest in support of his removal of the five courtroom spectators at the beginning of *voir dire* proceedings, *i.e.*, that the space in the courtroom was limited, that he wanted to seat as many prospective jurors there as possible, and that there was an overriding need to keep members of the public separate from venire persons; (ii) expressly noted that the members of the public were otherwise welcome to attend all court proceedings; and (iii) asked these five individuals to exit the small courtroom only for the limited period of time in which there was insufficient seating for members of the public to sit separate and apart from the prospective jurors. In addition, Petitioner did not object to the closure during the trial, and instead first raised it on direct appeal. In light of these facts, this Court finds that Petitioner's Ground One claim fails to provide a basis for habeas relief. This conclusion is consistent with other courts in this District who have rejected public-trial right claims based on similar facts.

For example, in *Venable v. Johnson*, No. 2:15-cv-6958 (SDW), 2016 WL 6662686 (D.N.J. Nov. 10, 2016), *cert. of appealability denied sub nom. Venable v. Admin. New Jersey State* (3d Cir. Dec. 9, 2016), Judge Wigenton concluded that the trial court's removal of family members from the courtroom during jury selection failed to warrant habeas relief where, *inter alia*, the removal of those individuals was limited to the jury selection portion of the trial and no contemporaneous objection to this course of action was raised by any party. *Venable* at *6. Judge

_____

court's ineffective assistance of counsel] analysis turned on an analysis of the right to a public trial that is inconsistent with *Waller*, § 2254(d)(1) is satisfied and the decision of the Superior Court is not entitled to AEDPA deference. . . . Having determined that the state court decision is not entitled to deference under AEDPA, we proceed to a *de novo* evaluation of the constitutional claim on the merits.") (citing *Panetti v Quarterman*, 551 U.S. 930, 953 (2007)). However, the Court notes that it still must presume that the unrebutted factual findings of the state court are correct. *Breakiron v. Horn*, 642 F.3d 126, 131 (state court factual findings are presumed correct when reviewing the merits of a habeas claim, regardless of whether that claim is reviewed *de novo* or under AEDPA's more deferential standard of review) (citations omitted).

Wigenton found it "doubtful that [this] closure . . . would be sufficient to undermine the values presented by the public trial right, and in turn it is doubtful that this closure could be said to truly impugn [p]etitioner's Sixth Amendment rights." *Venable* at *6 (citing *Greene*, 431 F. App'x at 195-96). Judge Wigenton thereafter expressly found that "[e]ven if the closure could be said to be violative of the Sixth Amendment to some extent, it would still not entitle petitioner to habeas relief for two reasons: (i) petitioner's counsel "fail[ed] to object to the closure" (*id.* at *7 (collecting cases)); and (ii) the brief closure did not inhibit the "interests inherent in the public trial right – that Petitioner receive a fair trial, that the prosecutor and judge be made aware of their responsibilities to the parties and the public, encouraging witnesses to come forward, and dissuading perjury [and therefore] was entirely too trivial to impugn Petitioner's right to a public trial." *Id.*

Likewise, in *Delgado v. Milgram*, No. 2:09-cv-3728 (JLL), 2011 WL 1431904 (D.N.J. Apr. 14, 2011), Chief Judge Linares denied habeas relief where the state trial judge, when confronted with the reality of a small courtroom in which a large number of venire persons had already been seated, indicated to members of the public then sitting in the courtroom that they would be asked to temporarily exit to avoid improper mingling with prospective jurors in the event additional potential jurors entered the courtroom.[5] *Id.* at *10. In so doing, the trial judge "stressed that such measure, if used, would be employed only to accommodate potential jurors, who were, by definition, critical to [p]etitioner's trial" and that "in the event the spectators/relatives were asked to step out, they would be allowed back into the courtroom once space becomes available." *Id.* Importantly, "[p]etitioner's counsel did not take issue with utilizing such measures." *Id.* The

---

[5] It is unclear whether the members of the public were ever actually asked to exit the courtroom. *Delgado*, 2011 WL 1431904, at *11.

Chief Judge noted that "the right to a public trial is an important structural right, [but] it is also one that can be waived when a defendant fails to object or outright concedes to the closure of the courtroom . . . if the justification for closure is sufficient." *Id.* at *12 (citing *Freytag v. Commissioner*, 501 U.S. 868, 896 (1991)). As such, insomuch as "a brief exclusion [occurred], both [the trial judge's] clear articulation of the specific trigger for such exclusion, coupled with [p]etitioner's counsel's express waiver of objection, indicate[d] that [p]etitioner's Sixth Amendment rights were not violated." *Id.* at *13.

As in *Delgado* and *Venable*, the record here makes clear that the exclusion of members of the public from the courtroom during Petitioner's trial was for a brief duration during *voir dire*, was done for purposes of keeping perspective jurors separate and apart from members of the public in light of the small size of the courtroom, and occurred without any objection from any party. *Accord Patton*, 502 F. App'x at 142 ("alleged courtroom closure was trivial [where defendants] averred that members of their family and the general public were barred from entering the courtroom . . . at the commencement of jury selection when the courtroom was full."). In light of the foregoing, Petitioner is not entitled to habeas relief on Ground One.

**B. Ground Two: Ineffective Assistance of Trial Counsel**

Petitioner also claims that he is entitled to habeas relief because he received ineffective assistance of trial counsel. (Am. Pet. at Ground Two.) More specifically, Petitioner claims that his trial counsel, Francis Cutruzzula, was ineffective because she failed to: (i) provide Petitioner with discovery to review; (ii) consult with Petitioner at the jail; (iii) use an investigator or otherwise conduct an adequate investigation; and (iv) object to the temporary closure of the courtroom during *voir dire*. (Am. Pet. at Ground Two.)

*1. Standard for Non-Structural Errors*

Claims of ineffective assistance of counsel are governed by the standard set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984); *accord Weaver*, 137 S. Ct. at 1910-11. Because Petitioner is seeking relief under 28 U.S.C. § 2254, "'[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable,' which 'is different from asking whether defense counsel's performance fell below *Strickland*'s standard.'" *Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). In other words, "[f]ederal habeas review of ineffective assistance of counsel claims is . . . 'doubly deferential.'" *Id.* (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)).

Under *Strickland*, a habeas petitioner bears the burden of demonstrating, first, "that counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). The "proper standard . . . is that of 'reasonably effective assistance'" in determining whether counsel's performance was deficient under *Strickland*. *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" based on the particular facts of a petitioner's case, viewed as of the time of the counsel's challenged conduct. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential [and] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

A petitioner must also show prejudice. Pursuant to *Strickland*, a habeas petitioner must also demonstrate that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299. "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, a petitioner must demonstrate that "there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Shedrick*, 493 F.3d at 299.

The foregoing standards apply to Petitioner's claims that Ms. Cutruzzula was ineffective based on her purported failures to provide Petitioner with discovery to review, consult with him in jail, and use an investigator or otherwise conduct an adequate investigation. None of these alleged errors, even if true, have been classified by the Supreme Court as structural in nature.

2. *Standard for Structural Errors*

The violation of a defendant's right to a public trial, on the other hand, is one of a limited number of errors which the Supreme Court has deemed to be structural in nature. *See Weaver*, 137 S. Ct. at 1911. *Weaver* is clear that "in the case of a structural error where there is an objection at trial and the issue is raised on direct appeal, the defendant generally is entitled to 'automatic reversal' regardless of the error's actual 'effect on the outcome.'" *Id.* at 1910 (citing *Neder*, 527 U.S. at 7). *Strickland* and its progeny are clear that in order for a petitioner to prevail on an ineffective assistance of counsel claim, he must demonstrate prejudice, *i.e.*, "that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In other words, clearly established Supreme Court precedent indicates (1) that when

a structural error occurs during trial and a criminal defendant's counsel contemporaneously and otherwise appropriately objected to that occurrence, that defendant would generally be entitled to habeas relief regardless of that error's ultimate impact in securing his criminal conviction; and (2) in order for a habeas petitioner to prevail on an ineffective assistance of counsel claim, a habeas court must first necessarily conclude that counsel's error adversely impacted the outcome of his criminal proceeding.

Against this backdrop the *Weaver* Court considered "the proper remedy for addressing the violation of a structural right, [specifically,] the right to a public trial" where the habeas petitioner claimed that his counsel was ineffective for failing to properly object. *Id.* at 1905, 1910. Ultimately, the Supreme Court determined that the petitioner in *Weaver* was still required to demonstrate prejudice but modified *Strickland's* prejudice requirement:

> [W]hen a defendant raises a public-trial violation via an ineffective-assistance-of-counsel claim, *Strickland* prejudice is not shown automatically. Instead, the burden is on the defendant to show either a reasonable probability of a different outcome in his or her case or, as the Court has assumed for these purposes, to show that the particular public-trial violation was so serious as to render his or her trial fundamentally unfair.

*Weaver*, 137 S. Ct. at 1911 (2017) (internal citations to opinion omitted).

*3. Application*

Petitioner claims that Ms. Cutruzzula rendered ineffective assistance at his trial because she failed to furnish discovery to Petitioner, did not meet and consult with Petitioner at jail, failed to use an investigator or otherwise conduct an adequate investigation, and did not object to the temporary closure of the courtroom during *voir dire*. (Am. Pet. at Ground Two.) Petitioner has not cited to any specific portions of the record nor provided any facts or evidence which

substantiate any of the foregoing factual assertions.[6]  This Court likewise has been unable to locate

any documents or information based on its independent review of the record that even marginally

suggest that Ms. Cutruzzula failed to furnish discovery, meet with Petitioner, utilize an

investigator, or otherwise conduct an adequate investigation.  Petitioner has similarly failed to

provide this Court with any explanation as to how any of his allegations regarding counsel's

purported deficient actions – even if true – prejudiced his defense or otherwise rendered his trial

fundamentally unfair.  (*See*, *generally*, Am. Pet., ECF No. 3; Pet'r's Nov. 3, 2015 Reply, ECF No.

10.)

       Petitioner raised these same ineffective assistance of counsel claims during PCR

proceedings.  (*See* Pet'r's Jan. 16, 2012 PCR Br. 19-25, ECF No. 9-19.)  Again, with the exception

of noting trial counsel's undisputed failure to object to the temporary removal of courtroom

spectators at the beginning of *voir dire*, Petitioner's PCR brief is utterly bereft of references to any

specific facts, evidence, or trial occurrences.  The PCR court rejected Petitioner's ineffective

assistance of counsel claims based largely on the lack of any appropriate factual support upon

which Petitioner could establish a *prima facie* claim under *Strickland*.  (Mar. 29, 2012 PCR Hr'g

Tr. 5, ECF No. 9-77.)  As explained by the PCR court:

> Petitioner claims that trial counsel was ineffective for failing to
> provide [P]etitioner with discovery, failing to hire an investigator to
> interview witnesses and failing to object when the courtroom was
> closed to the public during jury selection.
>
> These allegations are bald and unsubstantiated.  Petitioner provides
> no factual support for his arguments beyond merely asserting them
> as true.  Petitioner has also failed to state specifically which

---

[6]  The facts regarding counsel's failure to object to the temporary removal of members of the public
from the courtroom during *voir dire* have been gleaned by this Court through its independent
review of the record.

materials or information he was deprived or state with specificity how they would have affected his case.

Petitioner fails to state which evidence or which testimony would have likely changed the outcome of the proceedings his attorney failed to bring forward.

Petitioner has not demonstrated how spending too little quality time with counsel, not discussing case strategy and/or following counsel's advice prejudiced the outcome of this case.

Petitioner must . . . do more than make bald assertions that he was denied the effective assistance of counsel. Petitioner must allege facts sufficient to demonstrate counsel's alleged substandard performance.

. . . .

Each of [P]etitioner's arguments fall short of satisfying the *Strickland* two prong test. Petitioner has failed to show one, that counsel's representation fell below an objective standard of reasonableness, and two, that there's a reasonable probability that but for counsel's unprofessional errors the results of the proceeding would have been different.

(Mar. 29, 2012 PCR Hr'g Tr. 6-8, ECF No. 9-77.)

The Appellate Division affirmed the PCR court's denial of relief to Petitioner. *Johnson*, slip op. at 4 (N.J. Super. Ct. App. Div. Aug. 7, 2014). In so doing, it expressly found that each of Petitioner's specific Ground Two "ineffective assistance of counsel [arguments] lack[ed] sufficient merit to warrant discussion in a written opinion." *Id.*

Here, Petitioner has again failed to present any facts, context, or other information upon which this Court would be able to conclude that his trial counsel's performance was deficient, much less that "but for counsel's [wholly unsubstantiated] unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. As to the failure of counsel to object to the closure, Petitioner has not shown that the failure rendered his trial fundamentally unfair or demonstrated a reasonable probability of a different outcome in his case. *Weaver*, 137

S. Ct. at 1911. This Court's review of Petitioner's state court filings confirms that those documents in which he raised ineffective assistance of counsel claims are similarly devoid of any substantive support. (*See*, *e.g.*, Pet'r's Jan. 16, 2012 PCR Br. 19-25, ECF No. 9-19; Pet'r's Jan. 14, 2013 PCR Appeal Br. 27-28, ECF No. 9-24.) Because this Court has not been presented with – nor independently located – any facts or information in the record upon which it could find that Petitioner's trial counsel was ineffective or that he suffered resulting prejudice, this Court is likewise unable to find that the state court improperly applied *Strickland* and its progeny when it arrived at the same conclusion with respect to the same allegations. *See*, *e.g.*, *Thomas v. Horn*, 570 F.3d 105, 122 (3d Cir. 2009), *as corrected* (July 15, 2009) ("[Petitioner] has provided not a shred of evidence suggesting any probability that [his trial counsel's performance caused him prejudice]. He simply invites our speculation. Accordingly, [petitioner's] claim for habeas relief . . . was properly denied."); *Campbell v. Burris*, 515 F.3d 172, 186 (3d Cir. 2008) ("The District Court was powerless to overturn" the determinations of the state court that petitioner "provided no reason to believe that any of the alleged deficiencies in counsel's performance had resulted in *Strickland*-type prejudice" and "failed to show a reasonable probability that, but for counsel's professional errors, the outcome would have been different" where the state court record made clear, *inter alia*, that petitioner failed to "allege in the state court what information [the] investigation . . . would have produced that would have been helpful to him."); *see also Weaver*, 137 S. Ct. at 1912-13 (habeas relief inappropriate where "petitioner offered no 'evidence or legal argument establishing prejudice' in the sense of a reasonable probability of a different outcome but for counsel's failure to object [to the closure of the courtroom to members of the public during two days of *voir dire* proceedings].") (quoting *Strickland*, 466 U.S. at 694).

In light of the foregoing, this Court finds that the state courts' ineffective assistance of trial counsel-related rulings, detailed *supra*, are neither contrary to, nor an unreasonable application of *Strickland* and its progeny, nor have those rulings resulted in decisions based on unreasonable determinations of the facts in light of the evidence presented during Petitioner's state court proceedings.  As such, this Court denies habeas relief as to Ground Two.

### C. Certificate of Appealability

Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right."  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). For the reasons expressed above, Petitioner has failed to make a substantial showing that he was denied a constitutional right.  As jurists of reason could not disagree with this Court's resolution of the claims, this Court shall deny Petitioner a certificate of appealability.

### V.      CONCLUSION

For the foregoing reasons, Petitioner's amended habeas petition is denied.  A certificate of appealability shall not issue.  An appropriate Order accompanies this Opinion.


August 9, 2018                                          s/ John Michael Vazquez
Date                                                          JOHN MICHAEL VAZQUEZ
                                                               United States District Judge